## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAVID T. HARDY,<br><br>                Plaintiff,<br><br>        v.<br><br>BUREAU OF ALCOHOL, TOBACCO,<br>FIREARMS AND EXPLOSIVES, *et al.*,<br><br>                Defendants. | Civil Action No. 15-1649 (BAH)<br><br>Chief Judge Beryl A. Howell |

### <u>MEMORANDUM OPINION</u>

The plaintiff, David T. Hardy, a self-described "attorney and internet blogger who disseminates information relating to firearms law issues," Compl. ¶ 4, ECF No. 2, initiated this lawsuit against the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Department of Justice ("DOJ") and DOJ's Office of Inspector General ("OIG"), claiming that the agencies violated the Freedom of Information Act ("FOIA"), 5 U.S.C. § 522, by improperly withholding responsive documents he requested regarding ATF's policies on registered handguns and certain documents "given to" OIG "in connection with" an OIG report on ATF's National Firearms Registration and Transfer Record ("NFRTR"). *See* Compl. ¶¶ 10, 18, 21. Pending before the Court are the defendants' Motion for Summary Judgment, Defs.' Mot. Summ. J. ("Defs.' Mot."), ECF No. 22, and the plaintiff's cross-motion for summary judgment, Pl.'s Cross-Mot. Summ. J. and Opp'n to Defs.' Mot. ("Pl.'s Opp'n") at 1, ECF No. 24. For the reasons stated below, both motions are granted in part and denied in part. [1]

---

[1]       The plaintiff "agrees that Summary Judgment is appropriate as to" ATF since that agency "finally complied with Plaintiff's FOIA request." Pl.'s Opp'n at 1. Accordingly, judgment will be entered in favor of ATF.

## I.        BACKGROUND

On March 18, 2015, OIG received a FOIA request from the plaintiff seeking "any statements, surveys, or reports of interviews given" to OIG "in connection with OIG Report No. I-2007-006," titled "The Bureau of Alcohol, Tobacco, Firearms and Explosives' National Firearms Registration and Transfer Record, June 2007," (the "NFRTR Report"), which had been prepared by OIG's Evaluation and Inspections Division.  Compl., Ex. 3, FOIA Request to OIG, ECF No. 2-3; Defs.' Mot., Ex. 2, Decl. of Deborah M. Waller ("Waller Decl.") ¶ 3, ECF No. 22-2, and Ex. 4, NFRTR Report, ECF No. 22-4.[2]  The report gathered information about the NFRTR ("NFRTR"), an electronic database that contains records on almost two million weapons regulated by the National Firearms Act ("NFA").  NFRTR Report at 2.  OIG examined ATF's "effectiveness in maintaining the records of registrations and transfers of NFA weapons in the NFRTR . . . in response to requests from members of Congress who had received letters from citizens expressing concern about the accuracy and completeness of the NFRTR."  *Id.* at 3. OIG's review included interviews, data analyses and document reviews, an electronic survey, a site visit to an NFA Branch, which is responsible for maintaining the NFRTR, and a demonstration of the NFRTR database.  *Id.* at 24-26.

According to both parties, the requested records at issue fall into one of three categories: "(1) records of interviews and notes of telephone interviews, (2) survey results, a draft survey, survey data summaries, and survey data analysis, and (3) miscellaneous work papers, including indexes of materials and interviews; and summaries of a document and emails that were

---

[2]        Deborah Waller is the Government Information Specialist and the Freedom of Information Act Officer for OIG.  Waller Decl. ¶ 1.

reviewed."  Defs.' Mot., Ex. 3, Decl. of Nina S. Pelletier ("Pelletier Decl.") ¶ 5, ECF No. 22-3; [3]

*see also* Pl.'s Response to Defs.' Stmt. Of Undisputed Material Facts & Pl.'s Stmt. Of Material

Facts. Supp. Cross-Mot. Summ J. ("Pl.'s SUMF") at 3, ECF No. 24.

In August 2015, OIG prepared a response to the plaintiff's request, advising that OIG

deemed the responsive records "reflect[ive] of the deliberative processes of the OIG" and exempt

from disclosure pursuant to the "deliberative process" privilege under Exemption 5 of FOIA but,

due to a clerical error, this letter was not actually delivered to the plaintiff until after litigation

had already commenced.  Waller Decl. ¶¶ 5–6; *see also* 5 U.S.C. § 552(b)(5) ("Exemption 5")

(exempting materials that are "pre-decisional" and "deliberative").

In January 2016, after litigation in this matter had begun, OIG reviewed sixty documents

related to the NFRTR Report and "determined that portions of the records that were directly

quoted in the final report could be segregated and released without compromising the

deliberative processes of the OIG."  Waller Decl. ¶ 7.  The following month, on February 26,

2016, OIG provided the plaintiff approximately forty pages of highly redacted documents,

consisting of records of interviews from which OIG redacted the location, the participants, the

inspector, and nearly all of the summaries of discussion during the interview, s*ee* Pl.'s Mot., Ex.

1 at 1–21, ECF No. 24-1, along with an index of responsive records withheld under claim of

exemption, pursuant to *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) (the "*Vaughn* Index"),

Waller Decl. ¶ 7; Pl.'s SUMF at 4, ¶¶ 5–6.[4]  The *Vaughn* Index reflects the withholding, in

whole or in part, by OIG of sixty responsive documents totaling 511 pages, primarily on the

---

[3]       Nina Pelletier is the Assistant Inspector General for the DOJ, OIG, Evaluation and Inspections Division, which conducts reviews of DOJ components and makes recommendations for their improvement.  Pelletier Decl. ¶¶ 1–2.

[4]       "A *Vaughn* index describes the documents withheld or redacted and the FOIA exemptions invoked, and explains why each exemption applies."  *Prison Legal News v. Samuels,* 787 F.3d 1142, 1145 n.1 (D.C. Cir. 2015).

basis of the deliberative process privilege under Exemption 5.  *See* Defs.' Mot., Ex. 6, *Vaughn*

Index, ECF No. 22-2.

The plaintiff contends that OIG has improperly withheld documents under Exemption 5.

Pl.'s Opp'n at 8–16.[5]  If application of this exemption is not declared improper, the plaintiff

requests that the Court conduct an *in camera* review of the withheld documents, starting with a

sample of 79 pages, to determine whether they were properly withheld.  *Id.* at 16.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The moving party bears the

burden of demonstrating the "absence of a genuine issue of material fact" in dispute, *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific

facts supported by materials in the record that would be admissible at trial and that could enable

a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc. ("Liberty Lobby")*, 477

U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on

summary judgment, appropriate inquiry is "whether, on the evidence so viewed, 'a reasonable

jury could return a verdict for the nonmoving party'" (quoting *Liberty Lobby*, 477 U.S. at 248)).

"[T]hese general standards under [R]ule 56 apply with equal force in the FOIA context,"

*Washington Post Co. v. U.S. Dep't of Health & Human Servs.*, 865 F.2d 320, 325 (D.C. Cir.

1989), and the D.C. Circuit has observed that "'the vast majority of FOIA cases can be resolved

---

[5]      The plaintiff does not dispute that OIG performed a reasonable search, nor does he claim that Exemptions 3 and 6 were improperly used to protect the names and identities of certain individuals.  Pl.'s Opp'n at 7.  Moreover, although the plaintiff argues defendants "waived" Exemption 6 insofar as it relates to the National Firearm Act Trade Collectors Association, the defendants correctly note that Exemption 6 has not been invoked with respect to any documents referencing the NFATCA.  *See* Defs.' Reply Supp. Mot. Summ. J. ("Defs.' Reply"), at 11–12, ECF No. 27.  Thus, the only issue in dispute is whether OIG justifiably withheld documents pursuant to Exemption 5.

on summary judgment,'" *Brayton v. Office of U.S. Trade Representative*, 641 F.3d 521, 527
(D.C. Cir. 2011).

The FOIA was enacted "to promote the 'broad disclosure of Government records' by
generally requiring federal agencies to make their records available to the public on request."
*DiBacco v. U.S. Army*, 795 F.3d 178, 183 (D.C. Cir. 2015) (citing *U.S. Dep't of Justice v. Julian*,
486 U.S. 1, 8 (1988)).  Reflecting the necessary balance between the public's interest in
governmental transparency and "legitimate governmental and private interests that could be
harmed by release of certain types of information," *United Techs. Corp. v. U.S. Dep't of Def.*,
601 F.3d 557, 559 (D.C. Cir. 2010) (alteration adopted) (quoting *Critical Mass Energy Project v.
Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C.Cir.1992)), the FOIA contains nine
exemptions set forth in 5 U.S.C. § 552(b), which "are 'explicitly made exclusive,' . . . , and must
be 'narrowly construed,'" *Milner v. U.S. Dep't of Navy*, 562 U.S. 562, 565 (2011) (quoting *Envtl.
Prot. Agency v. Mink*, 410 U.S. 73, 79 (1973), and *FBI v. Abramson*, 456 U.S. 615, 630 (1982));
*see also Murphy v. Exec. Office for U.S. Attorneys*, 789 F.3d 204, 206 (D.C. Cir. 2015); *Citizens
for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice* ("*CREW*"), 746 F.3d 1082, 1088
(D.C. Cir. 2014); *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir.
2010).  "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy,
is the dominant objective of the Act."  *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).

In litigation challenging the sufficiency of "the release of information under the FOIA,
'the agency has the burden of showing that requested information comes within a FOIA
exemption.'"  *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904 (D.C. Cir. 1999)
(quoting *Niagra Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 18 (D.C. Cir.
1999)); *see also Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 352

(1979) (agency invoking exemption bears the burden "to establish that the requested information is exempt"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989); *DiBacco,* 795 F.3d at 195; *CREW*, 746 F.3d at 1088; *Elec. Frontier Found. v. U.S. Dep't of Justice ("EFF")*, 739 F.3d 1, 7 (D.C. Cir. 2014); *Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003). This burden does not shift even when the requester files a cross-motion for summary judgment because "the Government 'ultimately [has] the onus of proving that the [documents] are exempt from disclosure," while the "burden upon the requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur." *Pub. Citizen Health Research Grp.v. FDA*, 185 F.3d at 904–05 (alterations in original) (quoting *Nat'l Ass'n of Gov't Emps. v. Campbell*, 593 F.2d 1023, 1027 (D.C. Cir. 1978)).

An agency may carry its burden of properly invoking an exemption by submitting sufficiently detailed affidavits or declarations, a *Vaughn* index of the withheld documents, or both, to demonstrate that the government has analyzed carefully any material withheld, to enable the court to fulfill its duty of ruling on the applicability of the exemption, and to enable the adversary system to operate by giving the requester as much information as possible, on the basis of which the requester's case may be presented to the trial court. *See Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013) ("In FOIA cases, 'summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" (alteration adopted) (quoting *Consumer Fed'n of Am. v. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006))); *Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996) (instructing that agency affidavit "should

reveal as much detail as possible as to the nature of the document, without actually disclosing information that deserves protection[,] . . . [which] serves the purpose of providing the requestor with a realistic opportunity to challenge the agency's decision" (citation omitted)); *CREW*, 746 F.3d at 1088 (noting that agency's burden is sustained by submitting affidavits that "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith") (quoting *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)). While "an agency's task is not herculean[,]" it must "'describe the justifications for nondisclosure with reasonably specific detail' and 'demonstrate that the information withheld logically falls within the claimed exemption.'" *Murphy*, 789 F.3d at 209 (quoting *Larson,* 565 F.3d at 862). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (quoting *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011)); *Larson,* 565 F.3d at 862 (quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)).

The FOIA provides federal courts with the power to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant," 5 U.S.C. § 552(a)(4)(B), and "directs district courts to determine *de novo* whether non-disclosure was permissible," *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015), by reviewing the *Vaughn* index and any supporting declarations "to verify the validity of each claimed exemption," *Summers v. U.S. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998). As part of this review, district courts also have an "affirmative duty" to consider whether the agency has produced all segregable, non-exempt information,

regardless of whether the FOIA plaintiff has raised this issue. *Elliott v. U.S. Dep't of Agric.*, 596 F.3d 842, 851 (D.C. Cir. 2010) (quoting *Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007)); *see also Stolt-Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) ("[B]efore approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld.") (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007)); *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999) ("[W]e believe that the District Court had an affirmative duty to consider the segregability issue *sua sponte* . . . even if the issue has not been specifically raised by the FOIA plaintiff." (citations omitted)); 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection.").

## III.   DISCUSSION

OIG has withheld, in full or in part, records responsive to all three categories of requested documents, pursuant to the deliberative process privilege under Exemption 5.  Pelletier Decl. ¶ 5; Waller Decl. ¶¶ 8–10.  The contours of the deliberative process privilege are discussed first, before turning to whether OIG has sustained its burden of showing both that the contested documents are properly withheld under Exemption 5 and that all reasonably segregable portions have been disclosed.

### A.   Exemption 5's Deliberative Process Privilege

Intended to protect "open and frank discussion" among government officials to enhance the quality of agency decisions, *Dep't of Interior v. Klamath Water Users Protective Ass'n* ("*Klamath Water*"), 532 U.S. 1, 9 (2001), Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than

8

an agency in litigation with the agency," 5 U.S.C. § 552(b)(5); *see also Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735 (D.C. Cir. 2017) ("Exemption 5 . . . allows agencies to withhold information that would in the context of litigation be protected from discovery by a 'recognized evidentiary or discovery privilege.'" (alteration adopted) (quoting *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d at 874)). Specifically, the deliberative process privilege, under Exemption 5, "protects 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Loving v. U.S. Dep't of Def.*, 550 F.3d 32, 38 (D.C. Cir. 2008) (quoting *Klamath Water*, 532 U.S. at 8).

The deliberative process privilege serves at least three policy purposes. First, the privilege "protects creative debate and candid consideration of alternatives within an agency, and, thereby, improves the quality of agency policy decisions." *Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 772 (D.C. Cir. 1978) (citations omitted). "Second, it protects the public from the confusion that would result from premature exposure to discussions occurring before the policies affecting it had actually been settled upon." *Id.* at 772–73 (citations omitted). Third, "it protects the integrity of the decision-making process itself by confirming that 'officials would be judged by what they decided[,] not for matters they considered before making up their minds.'" *Id.* at 773 (alteration in original) (quoting *Grumman Aircraft Eng'g Corp. v. Renegotiation Bd.*, 482 F.2d 710, 718 (D.C. Cir. 1973), *rev'd on other grounds*, 421 U.S. 168 (1975)); *see also Coastal States Gas Corp. v. Dep't of Energy* ("*Coastal States*"), 617 F.2d 854, 866 (D.C. Cir. 1980).

"To qualify for the deliberative process privilege, an intra-agency memorandum must be both pre-decisional and deliberative." *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015) (citing *Coastal States*, 617 F.2d at 866). "Documents are 'predecisional' if they

are 'generated before the adoption of an agency policy,' and 'deliberative' if they 'reflect [ ] the give-and-take of the consultative process.'" *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d at 739 (alteration in original) (quoting *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d at 874). As the government concedes, "[a] pre-decisional document [is] not always protected by Exemption 5" because "a document must be both pre-decisional and deliberative for the deliberative process privilege to apply." Defs.' Reply Supp. Mot. Summ. J. ("Defs.' Reply") at 8, ECF No. 27 (citing *Access Reports v. U.S. Dep't of Justice*, 926 F.2d 1192, 1194 (D.C. Cir. 1991)). The government bears the burden of showing that the withheld document is both predecisional and deliberative. *Tax Analysts v. IRS*, 117 F.3d 607, 616 (D.C. Cir. 1997).

"Under the deliberative process privilege, factual information generally must be disclosed, but materials embodying officials' opinions are ordinarily exempt." *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (citations omitted). Nonetheless, "the D.C. Circuit has cautioned against overuse of the factual/deliberative distinction." *Goodrich Corp. v. U.S. Envtl. Prot. Agency*, 593 F. Supp. 2d 184, 189 (D.D.C. 2009) (citing *Dudman Comm'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987)). Consequently, the D.C. Circuit has taken a functional approach to application of the deliberative process privilege, instructing that "the legitimacy of withholding does not turn on whether the material is purely factual in nature or whether it is already in the public domain, but rather on whether the selection or organization of facts is part of an agency's deliberative process." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011) (citation omitted); *see also Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d at 1435 ("To fall within the deliberative process privilege, materials must bear on the formulation or exercise of agency policy-oriented *judgment.*" (emphasis in original) (citation omitted)); *Wolfe*

*v. Dep't of Health & Human Servs.*, 839 F.2d 768, 774 (D.C. Cir. 1988) (noting that, although "the fact/opinion distinction 'offers a quick, clear and predictable rule of decision' for most cases," courts "must examine the information requested in light of the policies and goals that underlie the deliberative process privilege" (quoting *Mead Data Central, Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 256 (D.C. Cir. 1977))); *Mead Data Central, Inc. v. Dep't of Air Force*, 566 F.2d at 256 (noting that "[i]n some circumstances, . . . , the disclosure of even purely factual material may so expose the deliberative process within an agency that it must" enjoy the deliberative process privilege); *Montrose Chem. Corp. of Cal. v. Train*, 491 F.2d 63, 71 (D.C. Cir. 1974) ("Exemption 5 was intended to protect not simply deliberative material, but also the deliberative process of agencies.").

Under this functional approach, an agency may not rely on the deliberative process privilege unless, if disclosed, the factual information would reveal something about the agency's deliberative process, *see Playboy Enterprises, Inc. v. U.S. Dep't of Justice*, 677 F.2d 931, 936 (D.C. Cir. 1982), or if the factual information is "inextricably intertwined with the deliberative sections of documents," *In re Sealed Case*, 121 F.3d at 737.  *See Access Reports v. U.S. Dep't of Justice*, 926 F.2d at 1195 (noting that the "'key question' in identifying 'deliberative' material" remains "whether disclosure of the information would 'discourage candid discussion within the agency'" (quoting *Dudman Comm'ns Corp. v. Dep't of Air Force*, 815 F.2d at 1567–68)).  This principle is applied below to OIG's justifications for withholding each of the three categories of documents.

**B.      Analysis of OIG's Application of the Deliberative Process Privilege**

The plaintiff challenges OIG's withholding under the deliberative process privilege of 511 pages in sixty responsive records falling into three categories of requested records: "(1)

records of interviews and notes of telephone interviews, (2) survey results, a draft survey, survey

data summaries, and survey data analysis, and (3) miscellaneous work papers, including indexes

of materials and interviews; and summaries of a document and emails that were reviewed."

Pelletier Decl. ¶ 5; Pl.'s SUMF at 3.[6]  Notably, the "predecisional" character of these withheld

records is not disputed.[7]  Consequently, analysis is limited to whether OIG has provided

adequate detail in the *Vaughn* Index and Waller and Pelletier declarations regarding the three

categories of documents to show that the "deliberative" prong of the deliberative process

privilege is met, justifying withholding of the records.[8]  *See, e.g.*, *Army Times Publ'g Co. v.*

---

[6]      As defendants note, the plaintiff also appears to marshal an argument that if there is a "public interest" in "verifying that agency watchdogs are doing their job," that is somehow an exception to Exemption 5.  *See* Pl.'s Mem. at 13–14; *see* Defs.' Reply at 8.  No such exception exists in the law.  *See, e.g.*, *Winterstein v. U.S. Dep't of Justice*, 89 F. Supp. 2d 79, 82 (D.D.C. 2000) (rejecting argument that Exemption 5 was overridden by a showing of public interest in the documents); *see also Sierra Club v. U.S. Dep't of Interior*, 384 F. Supp. 2d 1, 29 (D.D.C. 2004) ("Once a document is deemed exempt from disclosure pursuant to Exemption 5, there is no need for the court to consider the public interest in disclosure.").

[7]      The defendants assert that the documents at issue are all "predecisional," *see, e.g.*, Defs.' Mem. at 8; *Vaughn* Index at 1–35, and the plaintiff nowhere disputes this assertion.  Consequently, the Court deems the plaintiff's silence to be a concession that the predecisional requirement of the deliberative process privilege is satisfied for the challenged documents.  *See, e.g.*, *Abdus-Sabur v. Hope Vill., Inc.*, No. CV 16-156 (RBW), 2016 WL 7408833, at *9 (D.D.C. Dec. 22, 2016) (citing *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd*, 98 Fed. App'x. 8 (D.C. Cir. 2004) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.")); *see also Saunders v. Mills*, 172 F. Supp. 3d 74, 92 (D.D.C. 2016); *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 69 F. Supp. 3d 175, 228 (D.D.C. 2014) (citing *Mack v. WP Co., LLC*, 923 F. Supp. 2d 294, 302 (D.D.C. 2013)); *Craig v. D.C.*, 74 F. Supp. 3d 349, 367 (D.D.C. 2014)); *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d at 25)*; COMPTEL v. FCC*, 945 F. Supp. 2d 48, 55 (D.D.C. 2013).  In any event, OIG is correct on the merits.  The documents are assuredly predecisional because they were created "[a]ntecedent" to the NFRTR report.  *Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978); *see also Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014) ("To be pre-decisional, the communication (not surprisingly) must have occurred before any final agency decision on the relevant matter." (citation omitted)).

[8]      As a threshold matter, the defendants' *Vaughn* index is inadequate as it "completely lacks any detail regarding any particular record and does nothing more than generally state that Exemption 5 is satisfied."  *Cuban v. SEC*, 744 F. Supp. 2d 60, 77 (D.D.C. 2010).  *See Vaughn* Index 1–35 (stating, with respect to each document, that they contain "deliberative, predecisional communications" or "deliberative recommendations and opinions").  These "[b]are and conclusory assertions of the privilege are not sufficient."  *COMPTEL v. FCC*, 910 F. Supp. 2d at 122; *see also Coastal States*, 617 F.2d at 861 (noting that conclusory assertions of privilege are not sufficient to carry the government's burden of proof).  As the plaintiff notes, *see* Pl.'s Opp'n at 14, the *Vaughn* Index provides the same explanation for the use of Exemption 5, regardless of the type of document, stating that each withheld document consists of "recommendations and opinions contained in the interview statement," even if the document is clearly not an "interview statement," but rather a "Workpaper Index and Assignments Worksheet," an "Email Summary," an "Interview Workpaper," "Survey Results," a "Document Summary," "Final Survey Data," "Final Survey Data Analysis," a "Survey Draft," or "Survey Question Analysis,"  *see Vaughn* Index at 8–9, 15, 24–25, 32–34.  OIG's

*Dep't of Air Force*, 998 F.2d 1067, 1070 (D.C. Cir. 1993) (addressing only the deliberative

prong where the predecisional character of materials was not in dispute).[9]

---

repeated explanation, which appears to have just been copied and pasted verbatim throughout the *Vaughn* Index, is insufficient for "[t]he Court [to] be able to conclude that the defendant's position is the correct one to sustain the defendant's withholding of these records." *Cuban v. SEC*, 744 F. Supp. 2d at 77; *see also Muttitt v. U.S. Dep't of State*, 926 F. Supp. 2d 284, 306 (D.D.C. 2013) (holding that the State Department "failed to provide sufficient information" justifying the use of Exemption 5 with respect to ten documents because the State Department's defense "of its withholdings in its briefing consists mostly of conclusory quotations from case law that describes the kind of material normally exempt from disclosure under the privilege").

     Rather than correct its *Vaughn* Index, OIG accuses the plaintiff of "playing games by suggesting that these few typographical errors meaningfully detract from the sufficiency of the index," urging that "[t]he fact that the index inadvertently uses the term 'interview statement' in a few entries is completely immaterial given the index also contains a separate (accurate) description of each document in the index's second column." Defs.' Reply at 10 n.3. OIG's response is as disingenuous as it incorrect: the term "interview statement" is used not "in a few entries," but for *every* document withheld under Exemption 5, *see Vaughn* Index at 1–35, a fact that only highlights OIG's apparent lack of care in matching the "Brief Description of the Document" in the second column to the fuller "Description of Withheld Information" in the fifth column. To be sure, "a *Vaughn* index is not a work of literature" and "agencies are not graded on the richness or evocativeness of their vocabularies." *Landmark Legal Found. v. IRS*, 267 F.3d 1132, 1138 (D.C. Cir. 2001). Nor is it "the agency's fault that" documents at issue involve similar grounds for withholding, "thus leading to exhaustive repetition." *Id.*; *see also Carter, Fullerton & Hayes LLC v. Fed. Trade Comm'n*, 520 F. Supp. 2d 134, 142 (D.D.C. 2007) ("While there is some degree of repetition among entries within defendant's *Vaughn* index, repetition is to be expected, . . . ."). In this case, however, given the inadequacy of the *Vaughn* Index, which is riddled with incorrect descriptions and repetitive use of a conclusory legal standard for every withheld document, the declarations are critical in determining whether OIG sufficiently justified the applicability of Exemption 5 with respect to each document withheld.

[9]     The plaintiff also argues that withholding the documents under Exemption 5 was improper because the information would be "ordinarily available in discovery." Pl.'s Opp'n at 8. In support, the plaintiff submits a declaration from Robert E. Sanders, an attorney who had a 24-year career at ATF and attests, among other things, that OIG "work papers" raising questions about the accuracy of the NFRTR may be subject to disclosure in prosecutions for possession of alleged unregistered firearms as *Brady* material. Pl.'s Mot., Ex. 3, Decl. of Robert E. Sanders ("Sanders Decl.") ¶¶ 1–2, ECF No. 24-3. The plaintiff does not identify the precise documents he believes would be discoverable as *Brady* material. In any event, the D.C. Circuit has made clear that "disclosure in criminal trials is based on different legal standards than disclosure under FOIA, which turns on whether a document would be discoverable in a civil case." *Williams & Connolly v. SEC*, 662 F.3d 1240, 1245 (D.C. Cir. 2011). Thus, even if all of the documents at issue could be exculpatory or *Brady* material, Exemption 5 still applies unless the documents would "routinely be disclosed" in civil litigation. *See United States v. Weber Aircraft Corp.*, 465 U.S. 792, 799 (1984); *cf. Williams & Connolly v. SEC*, 662 F.3d at 1245 ("FOIA is neither a substitute for criminal discovery, . . . , nor an appropriate means to vindicate discovery abuses." (citations omitted)). Accordingly, the fact that some of the documents might be exculpatory or *Brady* material does not avoid application of Exemption 5.

     The plaintiff additionally argues that the NFRTR is used in civil forfeiture proceedings "to determine whether an NFA-regulated firearm is properly registered." Pl.'s Opp'n at 10. The Supreme Court has expressly cautioned, however, against the use of this kind of "hypothetical litigation" in order to determine the applicability of Exemption 5: "[I]t is not sensible to construe the [FOIA] to require disclosure of any document which would be disclosed in the hypothetical litigation in which the private party's claim is the most compelling." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 n.16 (1975); *see also Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 841 F. Supp. 2d 142, 162 (D.D.C. 2012) ("[A]n interpretation of Exemption 5 that would require courts to balance a private litigant's need against an agency's privilege claim in some 'hypothetical litigation' would be unworkable." (quoting *Sears, Roebuck & Co.*, 421 U.S. at 149 n.16)). Instead, whether Exemption 5 applies turns not on whether they might be available in some "hypothetical litigation," but rather if the documents are "routinely" available to parties in litigation. The plaintiff falls short, however, of establishing that the materials in question would "routinely be available." *See* Defs.' Reply at 3. Even assuming that such documents may be discoverable in certain contexts upon a particular showing of need, this does not compel the conclusion that Exemption 5 is inapplicable. *See Fed.*

OIG appears to suggest a blanket rule covering all the documents, asserting that even if the documents contain purely factual information, they were produced in preparation for a final public report and thus are non-disclosable.  *See* Defs.' Reply at 5 (asserting that even purely factual matter "'may so expose the deliberative process within an agency' that the material is appropriately privileged." (quoting *Mead Data Central, Inc. v. Dep't of Air Force*, 566 F.2d at 256).  The "limited exception to the general principle that purely factual material may not be withheld under Exemption 5 may not be read so broadly, however, as to swallow the rule," *Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs.*, 849 F. Supp. 2d 13, 37 (D.D.C. 2012), and "application of the deliberative process privilege is context-specific," *Edmonds Inst. v. U.S. Dep't of Interior*, 460 F. Supp. 2d 63, 70 (D.D.C. 2006).  Whether the deliberative process privilege applies is necessarily "dependent upon the individual document and the role it plays in the administrative process." *Coastal States,* 617 F.2d at 867.  Thus, while some "purely factual" documents may be protected by the deliberative process privilege, others may not.  Otherwise, "every factual report would be protected as a part of the deliberative process." *Leopold v. CIA*, 89 F. Supp. 3d 12, 23 (D.D.C. 2015) (quoting *Playboy Enterprises, Inc. v. Dep't of Justice*, 677 F.2d at 935).  As the plaintiff notes, "[u]nder Defendants' theory, all data, factual or not, is exempt under Exemption 5 because all data received would trigger an exercise of judgment on its investigators, and perhaps the survey responders as well.  This is an impermissible interpretation of FOIA which destroys the law."  Pl.'s Reply Def.'s Opp'n Cross-Mot. Summ. J. ("Pl.'s Reply") at 4, ECF No. 29.

---

*Trade Comm'n v. Grolier, Inc.*, 462 U.S. 19, 28 (1983) ("It is not difficult to imagine litigation in which one party's need for otherwise privileged documents would be sufficient to override the privilege but that does not remove the documents from the category of the *normally* privileged." (emphasis in original) (citation omitted)); *Martin v. Office of Special Counsel, Merit Sys. Prot. Bd.*, 819 F.2d 1181, 1184 (D.C. Cir. 1987) ("[T]he needs of a *particular* plaintiff are not relevant to the exemption's applicability." (emphasis in original)).  Consequently, the plaintiff has not established that Exemption 5 is applicable to any contested document withheld because that document would be "routinely" discoverable in civil litigation.

At issue, then, is whether, for *each* contested document withheld in part or in full, the declarations establish (1) "'what deliberative process is involved," *Senate of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 585–86 (D.C. Cir. 1987) (quoting *Coastal States*, 617 F.2d at 868), (2) "the role played by the documents in issue in the course of that process,'" *id.* (quoting *Coastal States*, 617 F.2d at 868), and (3) "'the nature of the decisionmaking authority vested in the office or person issuing the disputed document[s], and the positions in the chain of command of the parties to the documents,'" *EFF*, 826 F. Supp. 2d at 168 (D.D.C. 2011) (quoting *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 258 (D.C. Cir. 1982)).

### 1. Records of Interviews and Telephone Interview Notes

OIG's declarant describes the first category of documents, "records of interviews and notes of telephone interviews," as summaries of "information that line-level inspectors believed was relevant to the review that resulted in the" NFRTR report.[10]  Pelletier Decl. ¶ 6.  Although neither the *Vaughn* Index nor the declarations provide any information about who was interviewed, the NFRTR Report itself explains that OIG interviewed 58 ATF officials and staff, 10 contractors, 2 board members of the National Firearms Act Trade and Collectors Association, a representative of the National Rifle Association, and a federal firearms licensee.  NFRTR Report at 24.  The report also provides a table of the specific titles of each person interviewed, along with where the interview was conducted.  *Id.* at 25, (Table 2: Officials Interviewed).

While conceding that some notes "are factual in nature," OIG's declarant states that the records nonetheless "shed[] light on the deliberative process at work" because they illustrate "(1) the specific topics that the inspectors chose to focus on in developing their findings, and (2) what

---

[10]     The responsive documents listed in the *Vaughn* Index are not numbered, but identified only with Bates numbers.  The "Records of Interviews" are designated with the following Bates numbers: 001-0020, 0113-0139, 0143-0149, 0153-0200, 0218-0305, and 0310-0380.  *Vaughn* Index at 1–3, 5–8, 9–14, 16–24, 25–31.  The "Telephone Interview Notes" are labeled as Bates numbers 0021-0112 and 0215-0217.  *Id.* at 3–4, 15.

information inspectors chose to communicate to their supervisors."  Pelletier Decl. ¶ 6.

Accordingly, OIG's declarant asserts that the notes are deliberative because they "reflect[] the

thoughts of the author and internal communications about OIG findings still in development."

*Id.*  OIG is correct for at least two reasons.

First, to the extent information in the documents includes "recommendations" or

"opinions on legal or policy matters," they are clearly "deliberative" in nature and non-disclosure

is permissible under Exemption 5.  *Vaughn v. Rosen*, 523 F.2d at 1143–44.

Second, even if the documents contain "purely factual material," that information is still

covered by Exemption 5 because it would reveal the agency's deliberative process.  The

"Records of Interviews" and "Telephone Interview Notes" in this case are factual summaries

"culled by [OIG] from [a] much larger universe of facts presented to it" and therefore "reflect an

'exercise of judgment as to what issues are most relevant to the pre-decisional findings and

recommendations.'"  *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d at 513–14

(citation omitted).  As the D.C. Circuit made clear in *Mapother v. U.S. Dep't of Justice*, 3 F.3d

1533, 1539 (D.C. Cir. 1993), when "factual material [is] assembled through an exercise of

judgment in extracting pertinent material from a vast number of documents for the benefit of an

official called upon to take discretionary action," even purely factual matter is deliberative.

This principle was plainly set out in *Montrose Chemical Corp. of California v. Train*, 491

F.2d 63, 68–69 (D.C. Cir. 1974), where the Circuit addressed whether summaries of more than

10,000 pages of public factual information, created by the Environmental Protection Agency in

deciding whether to cancel DDT registrations, were properly withheld under Exemption 5.  The

Circuit considered whether a requester may "use the FOIA to discover what factual information

the [agency] aides cited, discarded, compared, evaluated, and analyzed to assist the [agency] in

16

formulating [its] decision," or if "such discovery [is] an improper probing of the mental

processes behind a decision of an agency." *Id.* at 68. "[E]ven if [an agency] cited portions of the

[public record] verbatim," the Circuit held that Exception 5 applied because an agency could be

"making an evaluation of the relative significance of the facts recited in the record." *Id.*

Recognizing that "separating the pertinent from the impertinent is a judgmental process,

sometimes of the highest order," the Circuit explained that "no one can make a selection of

[facts] without exercising some kind of judgment, unless he is simply making a random

selection." *Id.; see also id.* at 71 ("The work of the assistants in separating the wheat from the

chaff is surely just as much part of the deliberative process as is the later milling by running the

grist through the mind of the administrator.").

　　For this reason, interview notes and summaries are routinely found to be subject to

Exemption 5. *See, e.g.*, *McKinley v. Bd. of Governors of Fed. Reserve Sys.*, 849 F. Supp. 2d 47,

63–64 (D.D.C. 2012) (holding that "purely factual" information fell under Exemption 5 because

the defendant "culled selected facts and data from [a] mass of available information" (citation

omitted)); *Edmonds Inst. v. U.S. Dep't of Interior*, 460 F. Supp. 2d at 71 (holding that Exemption

5 applied where "disclosure of material considered for but not utilized in" public reports "would

reveal the editorial judgment of" agency staff (citation omitted))*; Bloomberg, L.P. v. SEC*, 357 F.

Supp. 2d 156, 169 (D.D.C. 2004) (holding that notes taken by SEC officials in meetings, even

though factual in form, were subject to Exemption 5 because they "distill[ed] discussions

reflecting the impressions of SEC officials").

　　As the records of interviews and interview notes constitute information "line-level

inspectors believed was relevant" from the interviews they conducted, Pelletier ¶ 6, the

inspectors would have had to "extract[] pertinent material" from a larger universe of facts,

*Mapother*, 3 F.3d at 1539, and thus the documents reflect an "exercise of judgment as to what issues" seemed most "relevant" to these inspectors to "pre-decisional findings and recommendations." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d at 513–14 (citation omitted); *see also Montrose Chem. Corp. of Cal. v. Train*, 491 F.2d at 68–69.

One final argument proffered by OIG warrants consideration. OIG's declarant states that disclosure of the interview notes would "chill the open, frank discussion between OIG inspectors and Department employees who are obligated by DOJ regulation and order to cooperate with OIG audits and inspections, . . . ." Pelletier Decl. ¶ 4. Specifically with respect to the "Records of Interviews" and "Telephone Interview Notes," OIG argues that "[t]he fact that a relatively small number of Department employees were interviewed as part of the inspection at issue here increases the chance that disclosure of the interview notes . . . could lead to the identification of individuals who provided information to the OIG." *Id.* In the circumstances of this case, that argument is not persuasive.

To be sure, Exemption 5 protects against disclosure that would "'discourage candid discussion within the agency.'" *Access Reports v. U.S. Dep't of Justice*, 926 F.2d at 1195 (quoting *Dudman Comm'ns Corp. v. Dep't of Air Force*, 815 F.2d at 1567–68)). The risk that disclosure of interview notes could link interviewees to particular documents is a salient factor that must be considered in determining whether Exemption 5 applies. *See Tax Analysts v. IRS,* 117 F.3d at 617 ("Exemption 5, and the deliberative process privilege, reflect the legislative judgment that 'the quality of administrative decision-making would be seriously undermined if agencies were forced to operate in a fishbowl . . . .'" (quoting *Mead Data Central, Inc.*, 566 F.2d at 256)). Nonetheless, exemptions to the FOIA are to be "narrowly construed," *Milner v. U.S. Dep't of Navy*, 562 U.S. at 565, and Exemption 5, in particular, must be construed "as narrow as

is consistent with efficient Government operations," *Fed. Trade Comm'n v. Grolier, Inc.*, 462

U.S. 19, 23 (1983) (alterations adopted).  In this case, OIG interviewed 72 individuals, far from a

"relatively small number" of employees, including over 50 ATF officials and staff members,

whose titles and locations are fully disclosed in the report.  NFRTR Report at 24-25.  Given the

significant number of interviewees, and the availability of redacting identifying information from

the documents, the possibility of linking any individual to a particular document is not a

colorable risk that would warrant withholding.  Thus, this rationale does not support the

application of Exemption 5.

Nevertheless, for the two reasons discussed above, the "Records of Interviews" and

"Telephone Interview Notes" are protected by Exemption 5 and need not be disclosed.

Accordingly, OIG's motion for summary judgment is granted with respect to the first category of

documents.

### 2. Survey-Related Documents

The defendants assert that the documents in the second category of survey-related

documents—consisting of "Survey Results," "Final Survey Data," "Survey Draft," "Final Survey

Data Analysis," and "Survey Question Analysis"—are all likewise deliberative.  The "Survey

Results" and "Final Survey Data" are discussed first, before turning to the "Survey Draft" and

then to the "Final Survey Data Analysis" and "Survey Question Analysis."[11]

#### a)   *Survey Results and Final Survey Data*

Portions of the "Survey Results," Bates numbers 0205-0214, 0491-0500, and "Final

Survey Data," Bates numbers 0381-0470, *Vaughn* Index at 15, 32–33, were quoted in the final

---

[11]   OIG's declarant and briefing reference "survey data summaries," Pelletier Decl. ¶¶ 5, 7; Defs.' Mem. at 2, 3, 8, 10, 11, but no documents are so described in the *Vaughn* Index.  Given this gap between the declarant's statement and the *Vaughn* Index, the information intended to be covered by any discussion of "survey data summaries" in the declarant's statement is unclear.

report and have been produced.  Nevertheless, OIG's declarant asserts that, like the records of interviews and interview notes, disclosing the remainder of the "Survey Results" and "Final Survey Data" "would clearly illustrate the deliberative process the OIG engaged in to determine what information was reliable and relevant to the findings in the final report."  Pelletier Decl. ¶ 7; *see also* Defs.' Mem. at 10.  OIG is mistaken.

Unlike the "Records of Interviews and "Telephone Interview Notes," survey data is quintessentially factual information that reveals little about an agency's deliberative process. The raw survey results and data are not summaries by individuals who "cull[ed]" information "from [a] much larger universe of facts," and thus do not "reflect an 'exercise of judgment.'"  *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d at 513 (citation omitted).  For this reason, courts have found that survey results are not the kind of factual information protected from disclosure under Exemption 5.  For example, in *Army Times Publ'g Co. v. Dep't of Air Force*, 998 F.2d 1067 (D.C. Cir. 1993), the D.C. Circuit reversed a district court's grant of summary judgment to the Air Force where the *Air Force Times* filed a FOIA request, seeking the "aggregate results" of surveys conducted by the Air Force.  *Id.* at 1070–72. The Air Force had conducted telephone polls and "released some of the poll results on its own initiative" but "refused to turn over the vast majority of the information requested" under the deliberative process privilege.  *Id.* at 1068.  The D.C. Circuit held that the "poll results released voluntarily by the Air Force contain purely factual information which could not threaten the Air Force's deliberative process in any way," and that "the affidavits submitted by the Air Force in support of its refusal to disclose do not even hint that the poll results withheld are different from those released in any relevant respect."  *Id.*  Noting the "fact that some of the information in the surveys is completely harmless suggests that other information in the surveys also might be

released without threatening the Air Force's deliberative process," the court concluded that the Air Force had not met its burden of demonstrating that "no reasonably segregable information exists within the documents withheld." *Id.*

Similarly, *Ludlam v. United States Peace Corps.*, 934 F. Supp. 2d 174 (D.D.C. 2013), addressed the Peace Corps' refusal to release survey results even though portions of the results had already been publicly disclosed. The Peace Corps asserted that "the entire . . . results are used to shape agency policy and decisionmaking." *Id.* at 189 (emphasis and citations omitted). The court rejected this position because the Peace Corps "offer[ed] no explanation as to why the withheld information constitute[d] pre-decisional deliberations connected to an agency policy or action," while the publicly released "responses in the same documents [we]re not." *Id.* at 189–90. The court stressed that "[i]n order to show that material is deliberative, the agency must identify 'what deliberative process is involved and the role played by the documents in the course of that process.'" *Id.* at 190 (quoting *Coastal States*, 617 F.2d at 868).

In this case, OIG sent an electronic survey to 609 ATF Industry Operations Investigators ("IOIs"), and 334 responded within the three weeks allotted for responses. NFRTR Report at 26. According to the report, 299 of these 334 responding IOIs "had experience inspecting federal firearms licensees with NFA weapons." *Id.* Appendix II of the report reproduced the electronic survey, disclosing all of the questions. *Id.* at 64-66, (Appendix II: OIG Survey Questions to Industry Operations Investigators). The survey included both multiple choice questions as well as questions that called for narrative responses. *Id.* at 65. For example, one question asked, "How often is a discrepancy between the NFRTR inventory report and the [federal firearms license] inventory due to an error in the NFRTR?" and provided the following possible answers: "Always," "Most of the time," "Sometimes," "Never," and "Don't know." *Id.* Additional

survey questions, calling for narrative responses, included "What do you do when there is a discrepancy between the NFRTR Inventory report and the [federal firearms license] inventory? Please describe the process and the actions you take." *Id.*

OIG released portions of the survey results in the final report, including aggregate data from the multiple choice questions as well as numerous direct quotations from the narrative responses. For example, OIG stated in the report that "46.5 percent (139 of 299) [of the IOIs] reported that they found a discrepancy between the NFRTR inventory report and a licensee's inventory 'always' or 'most of the time,'" and that "44.4 percent of respondents (133 of 299) said that the discrepancy was due to an error in the NFRTR 'always' or 'most of the time.'" *Id.* at 8; *see also id.* at 25-26. Further, throughout the report, OIG quotes directly from individual narrative responses by the IOIs who responded to questions from the survey. *See, e.g.*, *id.* at 14–17, 22, 27–28.

Given that OIG has already produced in the NFRTR Report the survey questions in their entirety, and the results and data in part, to withhold the remaining survey results and data, OIG must explain how the withheld information is "different from those released in any relevant respect." *Army Times Publ'g Co. v. Dep't of Air Force*, 998 F.2d at 1068; *see also Ludlam v. United States Peace Corps.*, 934 F. Supp. 2d. at 189–90. Otherwise, "[w]hatever chilling effect may be caused by release of the survey results [and data] . . . is already present." *Army Times Publ'g Co. v. Dep't of Air Force*, 998 F.2d at 1071; *see also Assembly of State of Cal. v. U.S. Dep't of Commerce*, 797 F. Supp. 1554, 1566 (E.D. Cal.), *aff'd*, 968 F.2d 916 (9th Cir. 1992) (concluding that numerical data containing "a list of numbers of people, broken down by race, associated with census tracts" was "purely factual and in no way divulge[d] the reasoning process through which the data was derived or in any way explain[ed] any recommendation or

decision not to adjust [a] census" (citing *General Servs. Admin. v. Benson*, 415 F.2d 878 (9th Cir.

1969) (holding that property appraisal data had to be disclosed), and *Pac. Molasses Co. v. NLRB*,

577 F.2d 1172 (5th Cir. 1978) (holding that a report that was "little more than a mechanistically

compiled statistical report which contains no subjective conclusions" was not protected by

Exemption 5))).

Further, the "Survey Results" and "Final Survey Data" are anonymized collections of

information from 334 individuals and, thus, disclosure of the results and data could not be used

to identify any particular respondent. *See Wilderness Soc'y v. U.S. Dep't of Interior*, 344 F.

Supp. 2d 1, 15 (D.D.C. 2004) (noting that "in cases where there is no identifying information

that would link an individual to a document" there is little likelihood that disclosure would injure

an agency's deliberative process). Even quotes from narrative responses to questions from the

survey cannot be tied to any particular survey respondent. Therefore, public disclosure is

unlikely "in the future to stifle honest and frank communication within the agency." *Id.* (quoting

*Coastal States,* 617 F.2d at 866).

Finally, this Circuit distinguishes between documents that "bear on the formulation or

exercise of agency policy-oriented *judgment*," and "materials relating to standard or routine

computations or measurements over which the agency has no significant discretion." *Petroleum

Info. Corp. v. U.S. Dep't of the Interior*, 976 F.2d at 1435–36. FOIA does not permit "scientific

studies [to be] cloaked in secrecy by an exemption designed to protect only 'those internal

working papers in which opinions are expressed and policies formulated or recommended.'"

*Bristol-Myers Co. v. Fed. Trade Comm'n,* 424 F.2d 935, 939 (D.C. Cir. 1970) (quoting *Ackerly

v. Ley*, 420 F.2d 1336, 1341 (D.C. Cir. 1969)). Here, OIG had no control over the content of the

survey responses and thus cannot say the "materials . . . bear on the formulation or exercise of

agency policy-oriented *judgment*."  *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d at

1435 (emphasis in original).[12]

Thus, with respect to the "Survey Results" and "Final Survey Data," OIG's motion for

summary judgment is denied and the plaintiff's cross-motion is granted, as OIG has not provided

sufficient "justifications for nondisclosure . . . to demonstrate that material withheld is logically

within the domain of" Exemption 5.  *PHE, Inc. v. U.S. Dep't of Justice*, 983 F.2d 248, 250 (D.C.

Cir. 1993).

> **b)**      ***Survey Draft***

The "Survey Draft," Bates numbers 0489–0490, *Vaughn* Index at 33, is described as "a

draft containing deliberative recommendations and opinions," *id*.  Since "[d]raft documents" are

typically considered deliberative, *Coastal States*, 617 F.2d at 866, this document is protected

from disclosure under Exemption 5.  Although the D.C. Circuit has explained that "an agency

cannot withhold the material merely by stating that it is in a draft document," *Dudman Comm'ns

Corp. v. Dep't of Air Force*, 815 F.2d at 1569; *see also Judicial Watch, Inc. v. U.S. Postal Serv.*,

297 F. Supp. 2d 252, 261 (D.D.C. 2004) (citing *Arthur Andersen and Co. v. IRS*, 679 F.2d at

257), disclosure of the "Survey Draft" would divulge information regarding "decisions to insert

or delete material or to change [the] draft's focus or emphasis" and thus "would stifle the

---

[12]      OIG relies on *Reliant Energy Power Generation, Inc. v. Fed. Energy Regulatory Comm'n* ("*Reliant Energy*"), 520 F. Supp. 2d 194 (D.D.C. 2007), for the proposition that the "facts contained within the survey results . . . illustrate the agency process of selecting and analyzing data to formulate the findings published in the final report," Defs.' Reply at 6–7, but this case is inapposite.  The documents at issue in *Reliant Energy* were "spreadsheets and tables that analyze[d] raw data that reflect natural gas and electric trends, which FERC collectively refer[red] to as 'data analysis.'"  *Reliant Energy*, 520 F. Supp. 2d at 205 (internal quotation marks omitted and alteration adopted).  Thus, at issue in that case was the "data analysis" and not the raw survey results and data.  OIG also relies on *Hooker v. U.S. Dep't of Health & Human Servs.* ("*Hooker*"), 887 F. Supp. 2d 40, 56–57 (D.D.C. 2012), which held that "data" underlying "manuscripts" fell under the deliberative process privilege because it was "generated as part of a definable decision-making process."  *Id. Hooker*, however, is distinguishable since the court found that the challenged documents "involve[d] deliberation and discussion about the data, not mere summaries."  *Id.* at 58.  Here, the survey data and results consist simply of raw polling and survey results and do not provide any information regarding the agency's "deliberation and discussion" of the survey responses.

creative thinking and candid exchange of ideas necessary to produce good . . . work," *Dudman Comm'ns Corp. v. Dep't of Air Force*, 815 F.2d at 1569 (exempting drafts of official Air Force histories); *see also Russell v. Dep't of Air Force*, 682 F.2d 1045, 1048–49 (D.C. Cir. 1982) (same); *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1120–21 (9th Cir. 1988) (holding that a draft environmental impact statement was exempt from disclosure because it would reveal the agency's evaluation of facts it considered).  Accordingly, OIG's motion for summary judgment is granted with respect to the "Survey Draft."

**c)**      ***Final Survey Data Analysis and Survey Question Analysis***

The record is sparse in describing what the *Vaughn* Index refers to as "Survey Question Analysis" and "Final Survey Data Analysis," Bates numbers 0501–0511 and 0471–0488, respectively, *Vaughn* Index at 32–35.  Specifically, the four documents titled "Survey Question Analysis," are not referenced by OIG's declarants or in the government's briefing, leaving only the *Vaughn* Index's vague and conclusory assertions that the documents "contain[] deliberative, pre-decisional information."  *Compare Vaughn* Index at 33–35 *with* Pelletier Decl. ¶¶ 5, 7, *and* Defs.' Mem. at 2–3, 6, 8, 10–11.

The single document described in the *Vaughn* Index as "Final Survey Data Analysis" is discussed by OIG's declarant only together with two other documents, "survey data summaries" and a "draft survey."  Pelletier Decl. ¶ 7.  According to OIG's declarant, these three documents "document the OIG's process of creating the survey and reviewing survey results" and disclosure would "illustrate the OIG's process of selecting and analyzing data to formulate the findings published in the final report" as well as "create confusion by providing the public with information that may not have ultimately been the grounds for the OIG's findings."  Pelletier Decl. ¶ 7; *see also* Defs.' Mem. at 10.  In other words, OIG provides only one general

25

justification for all three of these documents together, when, by its description, "Final Survey Data Analysis," appears to be different in nature from "survey data summaries" or a "draft survey."

"[T]o sustain its burden of showing that records were properly withheld under Exemption 5," however, "an agency must provide in its declaration and *Vaughn* index precisely tailored explanations for each withheld record at issue." *Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d at 188.  OIG has failed to provide a particularized account of the "Final Survey Data Analysis" and a specific rationale for its nondisclosure.  *See Animal Legal Def. Fund, Inc. v. Dep't of Air Force*, 44 F. Supp. 2d 295, 299 (D.D.C. 1999) ("The need to describe each withheld document when Exemption 5 is at issue is particularly acute because 'the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process.'" (quoting *Coastal States,* 617 F.2d at 867)).

Indeed, with respect to both the four "Survey Question Analysis" documents and the single "Final Survey Data Analysis" document, OIG has not provided "precisely tailored" descriptions of "what deliberative process [was] involved" in drafting the documents or "the role played by the documents . . . in the course of that process."  *Coastal States,* 617 F.2d at 868. Merely including the word "analysis" in a document's description is insufficient.  OIG does not describe with any specificity (1) the type of information contained the documents—whether merely collative of survey results or actually evaluative; (2) the particular role the documents played in any agency deliberations prior to or during the drafting of the NFRTR Report, or (3) "'the nature of the decisionmaking authority vested in the office or person issuing the disputed document(s), and the positions in the chain of command of the parties to the documents.'"  *EFF*, 826 F. Supp. 2d at 168 (quoting *Arthur Andersen & Co. v. IRS,* 679 F.2d at 258).  In short, OIG

has not provided sufficient information for the Court to determine, one way or the other, whether these documents are protected by Exemption 5.

OIG relies on *Reliant Energy Power Generation, Inc. v. Fed. Energy Regulatory Comm'n ("Reliant Energy")*, 520 F. Supp. 2d 194 (D.D.C. 2007) for the argument that the survey-related documents collectively are deliberative because they "illustrate the agency process of selecting and analyzing data to formulate the findings published in the final report," Defs.' Reply at 6–7 (citing *Reliant Energy*, 520 F. Supp. 2d at 206), but this reliance is misplaced.  In *Reliant Energy*, the Federal Energy Regulatory Commission ("FERC") provided, at length, specific descriptions of the "data analysis" document at issue, including that the data analysis consisted of "spreadsheets and tables that analyze raw data that reflect natural gas and electric trends." *Reliant Energy*, 520 F. Supp. 2d at 205.  Further, FERC explained that the data analysis detailed how investigators made "decisions about how to look at the data, how to select portions of the data to examine, and how to interpret the data," including "matters such as what types of transactions to examine[,] . . . what time periods, which companies' transactions, which sizes of transactions, [and] how to follow a series of transactions." *Id.* at 206.  By contrast to the fulsome description provided in *Reliant Energy*, in this case, OIG provides only vague descriptions, with no specific account of what deliberative information is in the documents.

Lastly, OIG's argument that releasing the "Final Survey Data Analysis" document would "create confusion" with the public is without merit.  *See* Pelletier Decl. ¶ 7; Defs.' Mem. at 10. The "risk of public confusion is a subsidiary rationale for the deliberative process privilege," *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d at 1437 n.10 (citing *Jordan v. U.S. Dep't of Justice*, 591 F.2d at 772), to exempt material that might "prove erroneous or incomplete," *id.* at 1436, or guard against the "premature exposure" of policies before final

adoption, *Jordan v. Dep't of Justice*, 591 F.2d at 772–73.  OIG has raised no concern about the

"Final Survey Data Analysis" document being "erroneous or incomplete."  Moreover, as the

final report has already been released, the disclosure of this document now would not result in

the "premature exposure" of any agency decision or policy.  Finally, the "confusion" rationale

"has special force with respect to disclosures of agency positions or reasoning concerning

proposed *policies.*"  *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d at 1437 n.10

(emphasis in original).  Here, OIG is not promulgating a "policy," it has merely released a report

about the adequacy of another agency's record-keeping.  Thus, if the "Final Survey Data

Analysis" document was released, there is no risk that the public would be confused about the

grounds for an agency's *policy*.  Thus, the confusion rationale is not a sufficient reason for

nondisclosure.

Accordingly, given the insufficient information about the nature of the documents, there

is a genuine dispute as to the material fact of whether the "Survey Question Analysis" and "Final

Survey Data Analysis" documents include deliberative information.  Thus, the parties' cross-

motions are denied, without prejudice, with respect to these documents.

\*              \*              \*

In sum, as to the "Survey Results" and "Final Survey Data," OIG's motion is denied and

the plaintiff's cross-motion is granted.  OIG is therefore enjoined from withholding these

documents on the basis of Exemption 5.  With respect to the "Survey Draft," however, OIG's

motion is granted and the plaintiff's cross-motion is denied.  Finally, the parties' cross-motions

for summary judgment are denied, without prejudice, with regard to the "Survey Question

Analysis" and "Final Survey Data Analysis" documents.  Should OIG choose to continue to

withhold these documents, the agency must renew its motion for summary judgment and

supplement both its *Vaughn* Index and declarations, providing adequate descriptions and precisely tailored justifications for nondisclosure.

### 3. Remaining Work Papers

Only two documents listed in the *Vaughn* Index are described as "workpapers":  (1) "Interview Workpaper," Bates numbers 0201–0204, *Vaughn Index* at 14; and (2) "Workpaper Index and Assignments Worksheet," Bates numbers 0140–0142, *Vaughn* Index at 8.  OIG's declarant clarifies, however, that, in addition to those two documents, the remaining workpapers at issue include (3) an "Email Summary," Bates numbers 0150–0152, Vaughn Index at 9; and (4) a "Document Summary," Bates numbers 0306–0309, *Vaughn* Index at 24-25.  *See* Pelletier Decl. ¶ 8.

The first document, "Interview Workpaper," "is a spreadsheet analyzing interview responses," that OIG describes as deliberative because it "provides a clear window into the OIG's thought process regarding what information should or should not be included in the final report."  *Id.*  The second document, "Workpaper Index and Assignments Worksheet," is described by OIG's declarant as "an OIG-generated log of all interviews and other data collected in the OIG's review of the NFRTR," and as deliberative because "it sheds light on what information the OIG was weighing and considering in developing its final report."  *Id.*  Finally, the third and fourth documents are "a summary of an email chain which the OIG reviewed in the course of preparing the NFRTR Report," and "a summary of a document containing information the OIG reviewed in the course of preparing the NFRTR Report," both of which OIG asserts "shed light on what information the OIG deemed possibly relevant to its findings."  *Id.* [13]

---

[13]     To bolster the withholding of these contested work papers, the defendants point out that OIG audits are subject to "peer review" by other Inspectors General, a process that "ensures OIGs conduct their work according to applicable standards and respects the sensitivity of deliberative material."  Defs.' Reply at 9 n.2.  While peer review may enhance the reliability and integrity of OIG audits, this is no substitute for the transparency provided by the

The "Interview Workpaper" falls under Exemption 5.  Even if the document contains purely factual material derived from interview notes, this document was prepared by "culling" information "from [a] much larger universe of facts," namely the interviews, and thus "reflect[s] an exercise of judgment."  *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d at 513 (internal quotation marks omitted); *see also Mapother v. DOJ*, 3 F.3d at 1539; *Montrose Chem. Corp. of Cal. v. Train*, 491 F.2d at 68–69.  Indeed, the document is a "spreadsheet" that analyzes the very interview responses this Court has already held to be deliberative.  *See* Part III(B)(1); *see also Reliant Energy*, 520 F. Supp. 2d at 205 (holding that "spreadsheets" that "analyze[d] raw data" were "protected by Exemption 5").  If the underlying information is protected by Exemption 5, it surely stands to reason that documents that analyze that information are also protected.  Thus, the "Interview Workpaper" may be withheld in full.

With respect to the "Workpaper Index and Assignments Worksheet," OIG has not met its burden of demonstrating that this document is subject to nondisclosure under Exemption 5.  Given that the NFRTR Report already divulges significant information about who was interviewed, how many interviews were conducted, and where they were conducted, along with information about how other data was collected, OIG has not explained why the disclosure of the "log of all interviews and other data collected" must be withheld in full.  As there is a high likelihood that some of the information in the "Workpaper Index and Assignments Worksheet" has already been disclosed in the NFRTR Report, and thus is "completely harmless," this "suggests that other information in the [document] also might be released without threatening [OIG's] deliberative process."  *Army Times Publ'g Co. v. Dep't of Air Force*, 998 F.2d at 1068.

---

FOIA.  Thus, whether disclosure of a particular OIG report is warranted does not turn on whether it was subject to "peer review."  The only pertinent question is whether an exemption applies to the general disclosure rule of the FOIA.

At a minimum, OIG has failed to explain how the information in the "Workpaper Index and Assignments Worksheet" differs so significantly from the publicly released information as to implicate adversely the interests to be protected by Exemption 5.

Moreover, while OIG's declarant attests that OIG conducted a "line-by-line review" and "has released all reasonably segregable non-exempt information to Plaintiff," Waller Decl. ¶ 13, this attestation is undermined by the withholding of the entire document, despite the publicly available information. *See Gatore v. U.S. Dep't of Homeland Sec.*, 177 F. Supp. 3d 46, 52 (D.D.C. 2016) ("[T]he possibility that the defendant now simply refuses to release [the document], as a whole, regardless of [its] specific contents, and contrary to the representation that each responsive document received a line-by-line review, represents a 'quantum of evidence' that overrides the presumption in favor of the agency's segregability determination."). Thus, OIG has not met its burden of showing that "no reasonably segregable information exists within the document[.]" *Army Times Publ'g Co. v. Dep't of Air Force*, 998 F.2d at 1068.

Relatedly, OIG has also not met its burden of showing that the "Email Summary" and "Document Summary" are subject to Exemption 5 or that no additional segregable information exists that may be disclosed from these documents. Although these documents are only partially withheld, *see Vaughn* Index at 9, 24; *see also* Pl.'s Cross-Mot., Ex. 1 at 4–7, ECF No. 24-1 (redacted productions of the "Email Summary" and "Document Summary"), they are highly redacted, disclosing only limited information from the documents quoted in the NFRTR Report, *compare* Pl.'s Cross-Mot., Ex. 1 at 4–7 *with* NFRTR Report at 22–23, 46. The "Email Summary" appears to be a summary of an e-mail chain originating with a person identified in the NFRTR Report as having the title of "Examiner." NFRTR Report at 38–39. The OIG declarants provide no information about whether this email qualifies as a supplemental response to a survey

question or about whether, contrary to his identification in the NFRTR Report, the author was nonetheless somehow involved in the deliberative process for the final report.  Likewise, no information is provided about any remaining emails in the chain, including the nature of the information, who authored the emails or to whom they were sent, let alone their role in the deliberative process.

Similarly, no information is provided about the author of the "Document Summary" or the nature of the information it contains.  While the NFRTR Report, at 46, attributes to a "Deputy Chief, Field Management Staff, Field Operations" a quoted statement that appears to be contained in the "Document Summary," no other information is provided for the Court to be able to assess whether the author of the "Document Summary" was involved in some way in the deliberative process, whether the information summarized was provided by the "Deputy Chief, Field Management Staff, Field Operations" to supplement interview or survey responses, or whether this document contains other segregable, factual information.

The presumption that OIG complied with its segregation obligation is overcome by the fact that OIG's justification for withholding the documents, even in part, "falls far short of the specificity required to justify non-segregation."  *McGehee v. U.S. Dep't of Justice,* 800 F. Supp. 2d 220, 238 (D.D.C. 2011) (citing *Johnson v. Exec. Office for U.S. Attorneys,* 310 F.3d 771, 776 (D.C. Cir. 2002)).  In particular, OIG has not provided descriptions of "what deliberative process [was] involved" in drafting the documents, *Senate of P.R. v. U.S. Dep't of Justice,* 823 F.2d at 585–86, "the role played by the documents . . . in the course of that process," *id.*, "'the nature of the decisionmaking authority vested in the office or person issuing" the two documents, "and the positions in the chain of command of the parties to the documents,'" *EFF*, 826 F. Supp. 2d at 168 (D.D.C. 2011) (quoting *Arthur Andersen & Co. v. IRS,* 679 F.2d at 258).  As noted, OIG

does not explain who drafted the email summary, who the emails were from and to whom they were sent, or how they were used in drafting the report.  OIG's declarant describes the "Document Summary" as "containing information the OIG reviewed in the course of preparing the NFRTR Report."  Pelletier Decl. ¶ 8.  This description is patently inadequate, however, as it would apply to *every* document and piece of information reviewed by OIG for the NFRTR Report, including the portions of documents OIG already disclosed.  If this rationale were sufficient to exempt material under Exemption 5, no information could ever be released.

Accordingly, with regard to the "Workpaper Index and Assignments Worksheet," the "Email Summary" and the "Document Summary," the parties' cross-motions are denied, without prejudice.  Should OIG continue withholding these documents, it is directed to submit a revised *Vaughn* Index or supporting declaration that "reassesses the issue of segregability" and "provides an adequate description of each [document] to support the defendant[s'] assertion that no" portion, or no other portion, "may be released."  *Gatore v. United States Dep't of Homeland Sec.*, 177 F. Supp. 3d at 53; *see also Muttitt v. Dep't of State*, 926 F. Supp. 2d at 309 (holding that because the court did not have "enough information to determine, one way or the other, whether the attorney-client privilege applie[d]" to a document, summary judgment was not warranted and the defendant could "either supplement its declaration demonstrating the applicability of the attorney-client privilege to th[e] document or disclose the document to the plaintiff.").  "Because a district court should not undertake *in camera* review of withheld documents as a substitute for requiring an agency's explanation of its claims exemptions in accordance with *Vaughn*, the Court finds that the best approach is to direct [the] defendants to submit revised *Vaughn* submissions."  *Am. Immigration Lawyers Ass'n v. U.S. Dep't of Homeland Sec.*, 852 F. Supp. 2d 66, 82 (D.D.C. 2012) (citing *Army Times Publ'g Co. v. Dep't of Air Force*, 998 F.2d at 1071–72)).

33

**IV.    CONCLUSION**

With respect to the three categories of documents, the parties' cross-motions for summary judgment are resolved as follows: (1) the defendants' motion for summary judgment is granted with respect to the "Records of Interviews," the "Telephone Interview Notes," the "Survey Draft," and the "Interview Workpaper," which documents are listed in the *Vaughn* Index, at 1–5, 9–31, 33, with Bates numbers 001–0020, 0021–0050, 0113–0139, 0143–0149, 0153–0200, 0201–0204, 0215–0217, 0218–0305, 0310–0380, and 0489–0490; (2) the defendants' motion is denied, and the plaintiff's cross-motion is granted, with respect to "Survey Results" and "Final Survey Data," which documents are listed in the *Vaughn* Index, at 32–33, with Bates numbers 0381–0470 and 0491–0500; and (3) the parties' cross-motions are denied, without prejudice, with respect to the "Survey Question Analysis," "Final Survey Data Analysis," "Workpaper Index and Assignments Worksheet," the "Email Summary" and "Document Summary," which documents are listed in the *Vaughn* Index, at 8, 9–10, 24–25, 33–35, with Bates numbers 0140–0142, 0150–0152, 0306–0309, 0471–0488, and 0501–0511.  For this last category of responsive records, OIG may either (a) supplement its *Vaughn* Index and declarations in accordance with this opinion, or (b) supply the plaintiff with the withheld documents.

Accordingly, OIG shall file jointly with the plaintiff, by April 21, 2017, a proposed schedule to govern further proceedings to conclude this matter.

An appropriate Order accompanies this Memorandum Opinion.

Date: March 22, 2017

_____
BERYL A. HOWELL
Chief Judge